259 S.W.2d 789 (1953)
PETERSON
v.
KANSAS CITY PUBLIC SERVICE CO.
No. 43126.
Supreme Court of Missouri, Division No. 1.
July 13, 1953.
*790 Charles L. Carr, Henry Depping, Hale Houts, Hogsett, Depping, Houts & James, Kansas City, for appellant.
Lyman Field, Rogers, Field & Gentry, Kansas City, for respondent.
CONKLING, Judge.
Plaintiff, Margaret Ellen Peterson, (here the respondent) had a judgment below upon the jury's verdict for $45,000 against defendant, Kansas City Public Service Company (here the appellant) for personal injuries claimed to have resulted when defendant negligently closed its bus door on plaintiff's foot when she was a passenger on the bus and while she was alighting therefrom, and then caused the defendant's bus to move forward while plaintiff's foot was caught in the bus door causing her to be injured. Defendant has appealed.
Defendant here concedes that plaintiff made a case for the jury on the issue of liability, and makes no complaint respecting instructions given or refused. In view of that concession it is unnecessary to here detail the facts of the accident. Defendant does contend, however, that there were various prejudicial trial errors and that the verdict was grossly excessive. Among other resulting injuries claimed was an impact to plaintiff's left breast which it was claimed resulted in a malignant cancerous growth which later necessitated surgical removal of the breast and other portions of her body.
Defendant first contends that on the voir dire examination of the jury the trial court erred in not excusing juror Frederick from the general panel because the latter there expressed the view that a cancer may be traumatic in origin. Mr. Frederick further stated:
"Q. Didn't you say that you would do your best in this case to evaluate the evidence as you heard it and to render a decision on the evidence? A. Yes. * * *."
The following question was asked by the Court.
"Q. Mr. Frederick, regardless of any question which has been asked you or any feeling you may have or any knowledge you may have about this case, could you and would you, if you were selected as a juror, go into the *791 jury box and render a fair and impartial verdict as between the plaintiff and defendant in this case and render your verdict according to the law and the evidence submitted from the stand and the instructions given you by the court? A. Yes, sir.
"Q. Would you do that? A. I most certainly would."
Mr. Frederick did not serve on the jury of twelve which tried the cause, and defendant relies on such cases as Theobald v. St. Louis Transit Co., 191 Mo. 395, 90 S.W. 354, Williamson v. St. Louis Transit Co., 202 Mo. 345, 100 S.W. 1072, and Carroll v. United Railways Co., 157 Mo.App. 247, 137 S.W. 303. But under the ruling of this Court upon a substantially identical situation, we held in Timmerman v. Terminal Railroad Ass'n of St. Louis, 362 Mo. 280, 241 S.W.2d 477, 483, that there was no error in not excusing the juror. We see no reason to now depart from the rule announced in the Timmerman case, supra. The contention is denied.
Defendant next contends that the trial court erred in refusing to exclude testimony that the trauma to plaintiff's left breast "might have aggravated a pre-existing cancerous condition," because aggravation of a pre-existing cancerous condition was beyond the scope of the petition. Defendant points to the testimony of Doctors Cummins, Reese and Coleman at indicated pages of the transcript.
In the indicated instance in the testimony of Dr. Cummins, the latter had been called as a witness by plaintiff. During the cross-examination of that doctor by defendant's counsel, Mr. Depping, the doctor mentioned the medical case histories of other carcinoma patients cited in a medical book written by a certain Dr. Boyle. The cases in question were of two brothers each of whom had died of that condition. The reference of the witness was not to the instant plaintiff at all. There is no merit in this contention.
Under an agreement of the parties plaintiff's counsel read the testimony of a Dr. Reese, as given upon a former trial of this case. After the direct examination of the witness (as it appeared in the transcript of the former trial) had been read to the instant jury by plaintiff's counsel, the defendant's counsel took the witness stand and read to the jury the cross-examination of Dr. Reese at the former trial. The doctor's testimony upon the former cross-examination and a motion to strike portions thereof (made at the former trial by defendant's counsel) were all read upon this trial to this jury by defendant's counsel Mr. Depping.
Exactly the same situation(as in the above instance of Dr. Reese) obtained with respect to the instance in the testimony of Dr. Coleman. That also was testimony given by Dr. Coleman at a former trial and was here voluntarily put into this record by Mr. Depping, as defendant's counsel. And here, too, defendant seeks to take advantage of a motion made at a former trial and directed at testimony introduced here by defendant. All of these contentions are without any merit whatever.
Defendant next complains of the claimed misconduct of plaintiff's counsel in twenty-one different trial incidents which defendant's brief asserts were "calculated to curry favor with the jury, produce prejudice against defendant and gain sympathy for the plaintiff." It is here contended that because of the cumulative effect of these claimed prejudicial occurrences defendant should be now granted a new trial. Analyses of these twenty-one claimed trial incidents after careful search, examination and consideration as to each, of the brief, the transcript and the motion for new trial reduces the so-called incidents to but one that we even notice in this opinion. Defendant's reply brief states: "It is true that objections were not made at the trial to many of these improprieties. It was a situation difficult to deal with by objections." But defendant contends that we should nevertheless consider them all under our Rule 3.27, and Calloway v. Fogel, 358 Mo. 47, 213 S.W.2d 405, 409. However, we do not agree that Rule 3.27 may be a refuge for counsel who make no record of objection because counsel may consider certain trial situations to be "difficult to deal with by objections."
*792 As to the above matters only a few of them could be actually dignified as a trial incident. Many or most of them were unbelievably inconsequential. Only a few of them had so much as a passing notice from defendant's counsel at the time of the occurrence. Seldom was an objection made to any of them. When objection was made it was generally sustained, or the matter was abandoned and not further pressed by plaintiff's counsel.
We notice one of the matters above classified as a trial incident. Defendant most strenuously and at great length contends that "plaintiff's counsel improperly asked in the presence of the jury for leave to increase the amount sued for to $75,000.00, the court erroneously permitted it and counsel [for plaintiff] in argument to the jury improperly capitalized upon the fact that the court had given him leave to so amend." The record does not support that quoted contention.
The record before us shows that at the close of the evidence upon behalf of defendant, at a "bench conference * * * outside the hearing of the jury" plaintiff's counsel requested and was granted leave to amend the prayer of the petition to increase the damages asked for to $75,000. This record further shows that after defendant's motion for new trial had been overruled and the appeal herein taken, defendant filed a motion to settle and approve the transcript on appeal. That motion alleged the parties were in dispute and unable to agree as to the correctness of the offered transcript. Among other points of that disagreement between counsel was one as to whether the above request to amend the prayer as to amount was within or without the hearing of the jury. The trial court heard evidence at length upon the issues raised by the motion to settle the transcript; and the court later signed, settled and authenticated the transcript showing the request to amend was outside the jury's hearing. The transcript having been "settled and approved by the trial court," we are bound by it as settled and approved. Gildehaus v. Jones, 356 Mo. 8, 200 S.W.2d 523, Ashton v. Buchholz, 359 Mo. 296, 221 S.W.2d 496.
If it was desired to do so, plaintiff's counsel was within his rights in asking the court's permission to amend the petition to increase the damages prayed. The amendment to the petition was made without objection, and upon their argument to the jury counsel for plaintiff and counsel for defendant each commented upon the fact that the amount sued for had been increased. When it was commented upon during the argument by counsel for plaintiff he merely remarked: "I asked leave to amend this case to ask for damages for this woman for $75,000.00. That is the amount that I ask you ladies and gentlemen to bring to this lady and I want to explain why we ask for this very substantial amount." In legitimate argument he explained to the jury why he asked for that sum in damages. Plaintiff's counsel in his argument did not "capitalize" upon the fact that the court had given him leave to so amend. And to the above noted statement in the argument of plaintiff's counsel with respect thereto, defendant made no objection whatever. This contention is utterly devoid of any merit whatever.
Defendant finally contends that the evidence "is insufficient to support a recovery of anything beyond a relatively nominal sum. * * * (and) is so grossly excessive as to indicate prejudice on the part of the jury." This contention calls for a rather full statement of the record evidence touching the extent of the injuries.
Plaintiff, a widow 59 years of age at trial time, testified that when injured, March 22, 1947, she was riding home from work on defendant's bus about 11 o'clock at night and had two large sacks of groceries; that she was in the act of alighting at her stop at the front end of the bus; that because her right ankle had been broken and surgically fused in 1942, she "sort of backed off" the bus, carrying one sack, having placed the other in the stair well of the bus; that as she was alighting the bus operator "shut the door" on her ankle and "give (the bus) a jerk and it threw me and I grabbed something on the outside of the bus." Witness Ragsdale testified that "* * * the bus started up before she got out of the door and she (plaintiff) was *793 caught in the door and I saw it. * * * "Q. How far did this bus carry this lady or drag her, however she went along, in your opinion in terms of feet? A. It was possibly 10 or 20 feet." Plaintiff testified that she grabbed something on the outside of the door, "anyhow I couldn't hold onto it. I was going down. I was hopping along. I was going down and I couldn't hold on. I don't know whether I hit the ground or not. If I did I must have jumped up awful quick." Plaintiff was thrown "solidly against the bus," and some of the canned goods in her sack "struck solidly against her left breast and left chest."
She was taken home by a passing motorist. Plaintiff was hospitalized that night and an examination by her physician, among other things, then showed she had sustained "extensive bruises to chest * * left shoulder and breast bruised." Her breast became discolored. A lump soon appeared in the left breast. Her physician first told her it was "an abscess from that bruise." She applied heat as prescribed and the lump disappeared, but it soon reappeared in the breast in the same place. She reapplied heat. It again disappeared but soon returned in the same place in the breast and she then went to Dr. Coleman about it. She later went to Dr. Black and Dr. Cummins and then to Dr. Claude Hunt. It was diagnosed to be malignant. By the last named surgeon the breast was operated in August, 1947, and the lump was then found to be cancerous. The radical mastectomy (breast removal) operation followed immediately. Final diagnosis was a scirrhous carcinoma of the breast.
Plaintiff testified that she never before had any lumps, swelling or pain in her breasts, and that before the accident her general health was good. Her surgeons found multiple axillary metastases. The cancer had broken out of the breast area and entering the lymphatic system had reached the armpit. In that operation with plaintiff under general anaesthetic Dr. Hunt removed also the muscles of the breast, both pectoral muscles (major and minor) the subcutaneous and axillary fat, all lymph glands in the armpit and the tissue which lies under the breast down to the ribs. Plaintiff was in the hospital for fourteen days. She thereafter had twenty or more X-ray treatments by Dr. Lockwood. Thereafter continuing to have great pain in the operation area, after "black lumps" appeared at the operation site, plaintiff returned to the hospital for a second operation in January, 1948. This operation performed also under general anaesthetic was the "excision of painful mastectomy scar." Since her operation plaintiff has never been free from pain in that area, and that pain has increased and her hand gets numb. But at trial time no return of malignancy had been discovered.
The jury could also have found that plaintiff had frequent resulting headaches, nausea with vomiting, dizziness and occasional double vision, and that the headaches and dizziness "may be continuous"; that for three years after the accident she had difficulty moving her neck and could not turn it to the left, and that condition later improved some but still continues in some degree and will be permanent; that there was muscle spasm and tenderness in the neck and into the trapezius muscle, and plaintiff's head motion is limited in all directions; that such disuse and restriction of motion resulted in a demineralization of all the cervical vertebrae with sclerosis or hardening of the margins of the fifth and sixth cervical vertebrae and diminution of disc space; that plaintiff sustained extensive bruises on her hips and back with an extreme tenderness of the spinal muscles and severe backache with muscle spasm in the lower regions for which she had many physiotherapy and diathermy treatments; that "it was necessary to put a brace or a corset on her back"; and that the back area involved was the lumbosacral joint and there was a limitation of back motion in all directions, including "limitation of flexion and extension of vertebral column and lateral bending." X-rays of plaintiff's lower back show a diminution of the disc space at the lumbosacral junction which produced muscle spasm and limitation of motion, which condition was shown to be permanent.
The evidence further is that plaintiff's right ankle, which had been broken and *794 then was fused and stabilized in 1942, sustained severe and extensive bruises and became badly swollen and has been weak. She has since had to wear special platform shoes and the ankle is tender and painful, and her ability to work upon it and move about is impaired. She has difficulty in sleeping and due to the extensive armpit operation now has to keep her left arm elevated much of the time.
It was the medical testimony here that medical experience has shown that of those women who have had malignant breast cancer followed by metastasis into the lymph system of the axilla before any surgery therefor, only 60 to 70 per cent are alive and disease free at the end of the five year period after surgery; and of that 60 to 70 per cent only 38 to 40 per cent are still alive at the end of a ten year period after initial surgery.
For many years plaintiff had been a practical nurse. Later she was switchboard operator at Osteopathic Hospital. Immediately following the accident plaintiff lost two weeks from her work at the hospital switchboard. After the first operation she lost two months from her work. After the second operation she was off from work for two weeks. At trial time she was a switchboard operator at the Lee Company. At the Osteopathic Hospital her pay was $115 per month. At the Lee Company she was paid $1 an hour for an eight hour day. At trial time plaintiff was able to do her household work, her washing and ironing and "a little" of the outdoor work in the yard.
Defendant argues that the testimony in this record is legally insufficient for the jury to find that the cancer which developed in plaintiff's breast was the result of trauma and was due to the injuries sustained in this occurrence. With that contention we do not agree. While one doctor testified: "I have never found from my experience that a single blow has ever produced cancer of the breast," there was also medical testimony that this trauma "did result in malignancy in the breast," and that, "that isolated instance of trauma resulted in that cancer * * * yes, it caused it * * * that is what caused it." Defendant's contention that its cross-examination of the doctors who testified that the trauma caused plaintiff's cancer destroyed the probative value of their above quoted testimony is without any merit whatever. We have carefully read and re-read this record and must conclude that defendant's contention in that respect is without substance. What was said by this Court in Kimmie v. Terminal R. R. Ass'n, 334 Mo. 596, 66 S.W. 2d 561, 565, and Hunt v. Armour & Co., 345 Mo. 677, 136 S.W.2d 312, 318, 319, was written in those cases of different records from the one now before us, and has no application whatever to the abundance of affirmative medical testimony to be found in the instant record which amply connects the trauma with the later cancerous condition in plaintiff's breast.
In the briefs of these parties much space is given to a discussion of whether the amount of the judgment in this case is excessive. Many cases are cited by each party. We have carefully examined those cases upon this question. We have reexamined some of the records in our files in some of those cited cases.
Our attention is called to Vitale v. Duerbeck, 338 Mo. 556, 92 S.W.2d 691, wherein there was before us the question of whether a verdict and judgment for $30,000 was excessive. In that case plaintiff had proved she sustained a traumatic breast cancer, and she also had many other severe injuries. We held that the judgment there was not excessive. From the circumstances there and the injuries, it is clear that Mrs. Vitales' case cannot rule the instant case. But in many respects the injuries and resulting conditions there are similar to those here and our conclusion there is helpful with the instant contention.
Is the verdict and judgment in this case excessive? Very few of the questions presented to us in any of our cases are more difficult or bring to us a deeper sense of our responsibilities. There exists no formula to determine whether a jury award is excessive as to damages allowed for personal injuries. No two cases are alike as to injuries sustained. The factors we *795 believe we must consider in each instance have been so recently and so often restated that we need not here repeat them. And in the last analysis of each such problem we must always apply the test of whether the judgment appealed from is in such amount, the record facts considered, as to shock the judicial conscience or whether it is within the bounds of reason. In the light of the foregoing record facts, this many faceted question has here been particularly difficult.
It is our considered judgment, however, that giving proper weight to all the factors which enter into the instant question the judgment appealed from is within the bounds of reason. The contention that the verdict and judgment is excessive in amount must be denied.
Finding no reversible error the judgment of the trial court must be and the same is hereby affirmed. It is so ordered.
All concur.